26 C.C.P.A. (Patents)
### GARDNER v. ZILLGER. *
### Patent Appeals No. 4009.

Court of Customs and Patent Appeals.
Feb. 27, 1939.

*Rehearing denied May 1, 1939.

Elmer Stewart, of Washington, D. C., for appellant.

Chester H. Braselton, of New York City (William Bohleber, of New York City, of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

JACKSON, Associate Judge.

This is an appeal in an interference proceeding by the senior party, D. B. Gardner, from a decision of the Board of Appeals of the United States Patent Office which reversed a decision of the Examiner of Interferences and awarded priority to the junior party, Arno Zillger.

Involved in the interference are the application of appellant Gardner, Serial No. 709,321, filed January 30, 1934, for reissue of patent No. 1,892,142, which was granted on application Serial No. 461,406, filed June 16, 1930, and the application of appellee, Zillger, Serial No. 626,579, filed July 30, 1932.

The single count in issue was taken by both parties from patent No. 1,887,472, of F. von Okolicsanyi and Wikkenhauser, which issued November 8, 1932, on an application filed September 17, 1930. As far as this appeal is concerned, the issue is between the parties Gardner and Zillger. Zillger, being the junior party, has the burden of proving his case by a preponderance of the evidence.

The single count is as follows: "An apparatus for television reception and reception of electrically transmitted pictures comprising in combination a linear source

of light intended to be controlled by the received currents and a rotary system of mirrors, the number of which corresponds to the number of the picture lines, the said mirrors being arranged next to one another along an axis of rotation and distributed at equal angular distances from one another over the range of rotation, the linear source of light being arranged to lie parallel to the said axis of rotation and to produce its image in the system of mirrors direct without the interposition of any optical system, and the minimum length of the individual mirrors being equal to the length of the picture lines."

The preliminary statement of Zillger alleges that he conceived the invention on or about December 5, 1922, disclosed it to others, and reduced it to practice on or about December 8, 1922 and that the first written description of the invention was made on or about May 15, 1932.

Zillger took testimony. Gardner, having taken no testimony, is confined to his filing date of June 16, 1930.

The Examiner of Interferences set out the subject matter of the invention as follows: "The subject matter in issue relates to a scanning apparatus for television reception. The apparatus consists of a linear source of light controlled by the received currents and a rotary system of mirrors. The number of mirrors is equal to the number of picture lines and the mirrors are arranged adjacent to one another at equal angular distances along an axis of rotation. The linear source of light lies parallel to the axis of rotation and no optical system is interposed. The minimum length of the mirrors is equal to the length of the picture lines."

It clearly appears from the testimonial record and the exhibits that in April 1923, appellee completely constructed and tested a scanning apparatus through which electric impulses, made by the transmission of music and voice coming through a radio receiver were visually observed as moving streaks of light appearing on the narrow, vertical, abutting mirrors of a rotating drum. It seems that in 1923 there was no broadcasting of images or pictures. Therefore, it was impossible for appellee to have demonstrated that his apparatus could show such images or pictures.

Appellee contends in his testimony and in his brief that images of music and sound are recognized in the art of television as a feature of television reception. To support this contention there was received in evidence a photostatic copy of a Radio News article, known as Exhibit No. 45. The article is dated October 1928.

The Examiner of Interferences disposed of this contention and held that the 1923 device was inoperable to show radio transmitted pictures as follows:

"The party Zillger states that television images of music and sound are recognized in the television art as a feature of television reception, and in this connection calls attention to the Radio News article (Zillger Exhibit 45). It does not appear however that the article supports this contention, particularly in view of a portion of the third paragraph which reads,

" 'It (the machine described in the article) was built, *not for the purpose of receiving television images,* but merely to show how ordinary voice and music "looks" in a television receiver.' (Italics added.)

"It would appear that *picutres* of voice and music might be received on a device which would be inoperable to receive any *intelligible television picture and a careful* consideration of the 1923 device indicates that such was the case in this device. To give a complete television picture the 'lines' must be scanned successively without interruption.

"The 1923 device comprises a circular drum E having mirrors F placed about the periphery thereof in abutting relationship (Exhibit 4). A careful analysis of the 1923 device shows that by reason of this abutting relationship only a portion of a television picture could possibly be scanned by this device.

"In viewing the light I through the horizontal slits V, the spot of light appearing will move from left to right through the window in the support H as the drum C and mirrors F are revolved in a clockwise direction. When the spot of light is at the extreme right edge of the window it is reflected from the backward edge of one of the mirrors. Since the forward edge of the next mirror abuts this backward edge the spot of light will not appear at the extreme left-hand edge of the window on the next lower slit, until the drum has revolved through a sufficient angle to bring this forward edge opposite the left edge of the window. The scanning of an image in the 1923 device is therefore interrupted for at least half of each line of the picture and no complete result could be obtained from this device for television purposes."

The Examiner of Interferences then held: "The 1923 device is therefore not only not a reduction to practice but likewise not a conception of the invention since one skilled in the art could not make it operable for television signals without further invention. This is readily apparent in consideration of the device constructed in 1928 and hereinafter termed the 1928 device."

The device of 1928 differed from the earlier device in that instead of the mirrors abutting each other longitudinally and being fastened in a vertical position around a cylinder or drum, relatively long, narrow mirrors were fastened in horizontal, spiral position to the vertical cylinder and overlapped so that in rotating the cylinder, as the backward edge of the preceding mirror is adjacent the extreme right-hand edge of the picture, the forward edge of the succeeding mirror is adjacent the extreme left-hand edge of the picture.

The Examiner of Interferences held that the device of 1928 would scan a complete picture without interruption and it is not disputed but that an image was received by and seen in this latter apparatus in the summer or fall of 1928. The only ground upon which the Examiner of Interferences held that the device of 1928 was not a reduction to practice was that the testimony concerning the successful operation of the device was vague. He stated as follows:

"The testimony as to the successful operation of the 1928 device is vague. Hagenlocker never saw a television picture but only light streaks produced by sound.

"Mrs. Zillger testifies that she saw a silhouette picture but gives no further particulars.

"Carp, testifying concerning the single television picture, states that the image was unsteady and faded considerably and that it appeared to be an image of a person's head (Q. 122, p. 263, Zillger Record). On cross-examination Carp stated that the image was a silhouette and he could not remember whether he was able to distinguish whether it was a man or a woman (X.Q. 408, p. 295, Zillger Record). When asked if the silhouette was in profile he stated (A.Q. 409, p. 295, Zillger Record):

" 'As I remember it the face seemed to move about but was never in such a way long enough to be absolutely certain for very long; as the picture disappeared and returned the performer may have changed.'

"The results of this test do not indicate that the device was very satisfactory. Only a flitting image was seen by the observers, the character of which could not accurately be determined.

"The party Zillger points to the New York Times articles of May 20th, June 20th and June 22nd, 1928 (Exhibits 42, 43, and 44) as indicating the difficulty in receiving television images. However, it appears from the article of June 22, 1928 (Exhibit 44) that quite clear images were received.

"The single reception of a television picture, which was never later repeated, leads to the conclusion that the device was not made to operate successfully and did not constitute a reduction to practice. This conclusion is strengthened by the fact that after the device was destroyed in the flood of January 1929 it was never rebuilt and no application was filed until July 1932. The device constructed in 1928 can not therefore be held to be a reduction to practice of the invention but only a conception of the invention as of that date."

The Examiner of Interferences held that although the appellee was entitled to the prior date of conception of the invention defined by the counts, he did not reduce to practice in 1928, and was not diligent from just prior to appellant's record date of June 16, 1930 to July 30, 1932, the filing date of the appellee's application.

The Board of Appeals, in its decision, we must assume, agreed with the holding of the Examiner of Interferences that the device of 1923 was not a conception of the involved invention, because in the decision of the board it stated: "The matter involved relates to a television system and the only question which we consider requires discussion by us is whether the party Zillger's demonstration in 1928 establishes a reduction to practice."

We can see no error in the concurring holdings of the tribunals below as to the device of 1923 and affirm the decision of the Board of Appeals in this respect. The decision of the Examiner of Interferences which held that the demonstration of the 1928 device was not a reduction to practice was reversed by the Board of Appeals as follows: "There appears to be no question but that the testimony of the corroborating witnesses show that an image of a person was received. It is true that the image was not very clear but we are of the opinion that, at that stage in the development of this art and under the conditions which

existed at the time the test of the party Zillger was made, the reception of a picture which could be distinguished as that of a person is about all that could have been expected. We believe, therefore, that that demonstration should be regarded as a reduction to practice.

"We do not understand that at the date above mentioned it was considered necessary, in order to receive a patent, for the applicant to disclose a device which would receive pictures in a clear and fully satisfactory manner."

█ The record would indicate that the reception of pictures was demonstrated at more than the one time definitely testified to by Mrs. Zillger, wife of appellee, and a witness named Carp. Appellee said that certain unnamed visitors had seen pictures at his home at one time or another and Mrs. Zillger testified she had seen them several times. In any event, the reception of an image or images was seen on one occasion by Mrs. Zillger and the witness Carp. We do not think that corroborating testimony need go to the extent of showing that every one of these demonstrations of the invention had to be witnessed.

It appears from the record that in the spring of 1928 the broadcasting of pictures was far from perfect. This is borne out by the statement of a representative of the broadcasting station, WGY, which appeared in the radio section of the New York Times of May 20, 1928, and a photostatic copy of this statement is in evidence.

The statement reads: "I want to make it clear that these early television pictures will not be masterpieces. But no matter what we put on the air, the television experimenters at this stage of the development will not be too critical. They must not expect a fine picture. They should be happy just to catch a glimpse of a moving image, whether it be a research engineer, a pretty girl, a horse or a camel. The nature of the picture should make no difference."

In another sheet of the same publication, dated June 20, 1928, a copy of which is evidence, a report from Roselle, New Jersey, concerning the broadcasts of WGY reads, in part, as follows: "Accompanied by a drone not unlike that of a passing airplane issuing from the loud speaker of a six-tube electrical set an image rather grotesque in shape flitted across the screen of the television machine. * * *"

The Examiner of Interferences evidently considered a statement reported to have been made by a research engineer of the General Electric Company which appeared in the radio section of the New York Times, dated June 22, 1928, a copy of which is in evidence, as sufficient to establish a clear reception of images broadcast by WGY.

The statement, evidently made by a newswriter and not quoted, is: "He said the images were quite clear and were about one inch square. * * *"

We are of opinion, considering all of the record on this phase of the issue, that the alleged statement of the research engineer merely meant that the image was quite clear *considering the state of the art of transmission of television pictures at that time.* It seems to be reasonable that if the transmitted pictures were clear, in the usual meaning of the term, in the spring or early summer of 1928, that achievement would certainly have been announced by the broadcasting stations.

Furthermore, there is uncontradicted evidence that the 1928 device was specifically adapted to receive the television pictures broadcast by station WGY. Appellee knew the number of picture lines per second that station WGY transmitted. Likewise, there is no contradiction of the fact that his drum contained 24 mirrors to correspond with the 24 picture lines transmitted by station WGY and the motor of his device was adjusted for 1200 R. P. M. which was the correct number of revolutions per minute to enable the device to show twenty complete pictures per second, thus showing moving images. There is also evidence in the record that Zillger had a schedule of the television broadcasting time of station WGY. These facts, coupled with the evidence that images were actually received indicate that there was an actual reduction to practice in the summer or early fall of 1928.

We are of opinion, as was held by the board, that under the then prevailing conditions and circumstances, appellee has shown a reduction to practice by his demonstration of the device of 1928.

Although appellee did not file his application for approximately four years after he reduced to practice and while the record shows that his 1928 device was destroyed by flood and not rebuilt, the question of suppression or being spurred into activity when appellant entered the field is not be-

fore us. This appeal has been brought solely on the theory that there has been no sufficient showing of reduction of the invention to practice and lack of diligence on the part of appellee from just prior to appellant's record date of June 16, 1930, to appellee's filing date of June 30, 1932.

Since we agree with the board that appellee has properly shown reduction to practice, the question of subsequent diligence need not be considered.

The decision of the Board of Appeals is affirmed.

Affirmed.